31145.   WOODRUFF *v.* TROST, executrix.

DECIDED MARCH 13, 1946.   REHEARING DENIED MARCH 26, 1946.

*Swift, Pease, Davidson, Swinson & Chapman, Weekes & Candler, Powell, Goldstein, Frazer & Murphy,* for plaintiff in error.

*Foley & Chappell, Forrest L. Champion Jr., Samuel E. Kelley Jr., J. F. Terry,* contra.

FELTON, J. ■ The evidence in this case covers about 300 pages. To quote it at length would confuse the reader rather than enlighten. As deduced from the pleading and the evidence of the plaintiff a recovery was sought by him on the first count on the theory that the value of the services rendered as a whole was the value of the work done by the plaintiff plus other sums to be determined by how much money the plaintiff's services saved or helped save the defendant. In paragraph 8 of the plaintiff's petition he alleges: "The United States relieved defendant entirely of the additional income-tax assessment for the year 1931 in the sum of $96,939.66 but defendant, without waiting for an adjudication on tax assessment for the year 1932 in the sum of $57,667.53 entered into a compromise settlement and adjustment of the same with the United States Government, the amount of such settlement and compromise being unknown to the plaintiff, but the same was advantageous to defendant because of plaintiff's services aforesaid." After a careful study of the evidence we have concluded that there is not sufficient evidence to support the jury's finding either on the theory that the actual work done was worth a particular amount, or that the results obtained were worth a particular amount or that both combined were worth a particular amount. The evidence does not show how many days the plaintiff worked nor the amount of work performed. Neither does it show how the plaintiff's work affected the final outcome of the income-tax case. While the plaintiff was employed by the defendant on other work and for which he has been paid, it was discovered that the defendant had failed to report in his Federal-income tax return the sale of 6000 shares of Coca-Cola stock in 1931 and 4000 shares in 1932, which fact was immediately brought to the attention of the tax authorities. These omissions and the transfer to Mr. Woodruff of 800 shares of the stock of a corporation in which he owned practically all of the stock necessitated a reworking of the records of Woodruff for the years in question. The plaintiff testified that about March 16, 1935, Mr. Woodruff employed him to do this reworking of the records on the basis of

"accounting work" and not on the basis of $5 per hour as he had been employed during the period from February 23 to March 16, 1935. The plaintiff began work under this agreement about March 16, 1935, according to his testimony. The government was examining Woodruff's 1932 income-tax returns at this time under a routine check-up as the statute of limitations had not run against this year nor had the question of fraud arisen which would have permitted an investigation of the returns for that year or any previous year had fraud been charged by the government against Woodruff. The return for 1931 was, of course, barred by the statute of limitations unless the government asserted fraud. Since there had been a failure to report the sale of the 4000 shares on the 1932 return and the identical failure to return the sale of 6000 shares in 1931, it was Mr. Trost's opinion that Mr. Woodruff should get the government to settle 1932 by Woodruff's paying the deficiency for 1932 caused by the failure to report the sale of the 4000 shares as income for 1932 and thereby eliminate the question of fraud for 1932, thereby placing the government in the position that having failed to assert fraud for 1932, it could scarcely assert fraud for 1931 where the taxpayer had, in making his return, done exactly the same thing; and thus having eliminated the question of fraud, the only basis upon which the government could reopen and investigate returns for years barred by the statute of limitations, all years prior to 1932, would be forever closed to the government. The government received a letter from Mr. Woodruff agreeing to pay $27,000 additional tax for 1932. This consent on the part of Woodruff was later refused and all efforts to settle for 1932 without a re-examination of 1931 were in vain. In the interim Mr. Trost had discovered the case of Koshland v. Helvering, 298 U. S. 441 (56 Sup. Ct. 767, 80 L. ed. 1268, 105 A. L. 756), which he thought relieved Mr. Woodruff of all the extra assessment for 1932 and Mr. Woodruff withdrew his consent to pay the $27,000 assessment for 1932. It was Trost's opinion that if 1932 was settled and 1931 not re-examined the government would be precluded from examining previous years in which Trost stated there was much income unreported. As we have said, his effort to work out this method of procedure availed nothing. As a consequence a 90-day letter was issued by the government which in effect made an extra assessment for 1931 of $64,626.44, prin-

cipal and $32,313.22, penalty, and for 1932, $38,445.02, principal, and $19,222.51, penalty, plus interest as provided by law. This was consented to by Woodruff, the plaintiff, and Woodruff's attorney. Woodruff then discharged his Washington, D. C. attorney and the plaintiff and employed a law firm in Atlanta to handle the case. The case was settled on the basis that there was no tax due for 1931. The 1932 tax was settled for an additional payment of $30,000 tax due, $1500, representing a 5 percent negligence penalty, and interest on the $30,000 tax from the date due, totalling approximately $41,000. The evidence showed that Mr. Woodruff's 1931 return showed a loss of $200,000. According to the method of reporting sales of stock made by Mr. Trost if the sale of the 6000 shares in 1931 was added there still would have been a loss shown for the year. There is no evidence that he identified any of the 6000 shares which were not reported in 1931, or the 4000 shares not reported in 1932. Nor did his opinion that the Koshland decision would wipe out the 1932 assessment prevail. It was shown by the witness Kane, a member of the law firm which finally adjusted the case, that he (Kane) identified 1900 shares sold in 1931 as a result of which there was a loss on these sales when the computation as made for that transaction by Trost showed a profit of about $190,000. It is not shown whether this correction had any effect on the finding that no tax was due for 1931. There is no evidence showing that Mr. Trost did anything material to effect a reduction of the taxes assessed such as to authorize any such verdict as that rendered, other than his accounting work for which he was paid by Mr. Woodruff. He was entitled to remuneration for his work, but this remuneration cannot- be based on the results obtained when there is no evidence of the work's bearing on the results obtained. This is not a case of breach of contract for a contingent fee where services are rewarded on the basis of results, whether the work accomplished the results or not. To illustrate our position more clearly, it is plain from the record that the plaintiff based his claim in the first count on his actual work plus results accomplished. The plaintiff himself testified as to both. The plaintiff put up expert accountants to substantiate his own testimony and claims. They were asked hypothetical questions, of course based on facts the jury was, under his contentions, authorized to find. This question was asked

these accountants: "Q. I will ask you this question, Mr. Mark-walter, and then ask you if you will tell the jury what your opinion of the reasonable prevailing charge would be; if a Federal income taxpayer had omitted from his 1932 income tax return sale of 4000 shares of Coca-Cola 'A' stock of the value of approximately $147,000 dollars and had omitted from his 1931 Federal tax return the sale of 6000 shares of Coca-Cola 'A' stock amounting to approximately $308,000 dollars, and it further developed that over a period of 12 years he had conducted large scale operations in stock transactions through various brokerage houses and had used unauthorized methods of identification of certificate and had furthermore mingled his own personal transactions with the transactions of a personal holding corporation of which he owned 99 percent of the stock and such taxpayer, in February, 1935, employed a certified public accountant in Columbus, Georgia, of the general standing, which is within the Atlanta District of the Treasury Department to handle such tax problems and as a result of this employment the accountant made numerous trips to Atlanta, Georgia and in Washington, D. C., and if such accountants steadfastly and successfully refuted any charge of fraud which was asserted by the government, in June 1937; that the United States Government issued a 90-day letter claiming a tax of $64,626 dollars and a penalty of $32,313 dollars or an aggregate of $96,939-.44 dollars for the year of 1931 and the tax of $38,445.02 dollars and a penalty of $19,221.15 dollars for the year 1932, or an aggregate of $57,667.53 and if thereafter the Board of Tax Appeals decided that there was no tax due for the year 1931 and the contentions of the government of the year 1932 were settled by an attorney for $30,000 after the accountant had been relieved of further participation in the case immediately after the receipt of the 90-day letter, then Mr. Witness, what, in your opinion, would be the ordinary and reasonable charges usually made for such services by members of the same profession of similar standing?" This question shows that the value of the services as a whole is to be based on work and results, as stated. There being no evidence from which the jury could have reasonably and properly evaluated the plaintiff's services as a whole, the verdict on the first count must be set aside on the general grounds, although the jury could have evaluated isolated parts of the services but which it did not

seek to do. This ruling is not to be construed to mean that the plaintiff is not entitled to recover some amount under count 1.

■ The second count sought recovery for the alleged reasonable value of services rendered in the recovery of 1200 shares of Coca-Cola stock of the value of approximately $190,000 and about $6800 cash dividends thereon. In 1934 Mr. Woodruff had deposited 400 shares of Coca-Cola stock with the State Street Trust Company of Boston, hereinafter called the bank, as collateral security for a loan of $50,000. The stock was in four certificates and each was registered in what is called "street names," or the names of four brokers. After the stock was deposited with the bank a stock dividend of 300 percent was declared. The new stock was mailed to the registered holders of the old stock and not to the bank or to Mr. Woodruff. In checking Mr. Woodruff's 1934 income-tax returns, for which work he was separately paid, Mr. Trost concluded that Mr. Woodruff was not receiving all of his Coca-Cola dividends and called the matter to Mr. Woodruff's attention. At Mr. Woodruff's direction Mr. Trost wrote to the bank on May 21, 1936. The bank advised that it had 400 shares of stock but that it had not received the dividend stock. On May 30, 1936, Mr. Trost wrote E. F. Hutton & Company asking for information as to the 1200 shares of dividend stock. On June 8, he wrote to the liquidator of J. F. Trounstine & Company concerning the 200 shares represented by the certificates registered in the name of Trounstine & Company and the stock and cash dividends thereon. On June 8, he wrote William E. Levis about the 100 shares registered in his name. He received a letter dated June 5, 1936, from E. F. Hutton & Company, which stated that it held 300 shares of the dividend stock, and told Mr. Trost how to locate Mr. William E. Levis and to communicate with the liquidator of Trounstine & Company. In this letter Hutton & Company offered its assistance in locating the stock and suggested that it might expedite matters if the bank was instructed to deliver the 400 shares of pledged stock to it and that it be permitted to collect the dividends. On June 8, Mr. Trost wrote Hutton & Company that he had written the bank to send the stock to it. On June 8, Hutton & Company wired that the shares had not been received and suggested that they be furnished with a name in which to have the stock registered to protect future dividends. On June 16, Mr.

Trost wrote Hutton & Company, confirming a telegram and saying that he had communicated with all the holders of the stock and giving the names and addresses of each. On June 19, Hutton & Company wired Mr. Trost for stock powers signed by Mr. Woodruff. On June 19, Mr. Trost transmitted the stock powers with instructions from Mr. Woodruff as to what to do with the stock. On July 12, Mr. Trost wrote Hutton & Company for information as to the progress of the matter. On July 13, Hutton & Company sent Mr. Woodruff the 1200 shares of dividend stock registered in his name and a check for $6800 representing the dividends. On July 16, Mr. Trost wrote Hutton & Company acknowledging receipt of the stock and check and thanking it for their favors pertaining to the matter. The plaintiff in error contends that the verdict for $5000, on count 2 is excessive and so much so as to indicate bias and prejudice. We do not agree with this contention. Assuming for the sake of argument that the stock and dividends thereon were not lost, but merely misplaced, it is doubtful that under the circumstances the bank would be liable to Mr. Woodruff for the dividends on the stock held by it as collateral, which was not registered in his name. Why could not the bank assume that Mr. Woodruff knew in whose name the stock was registered and that he would be attentive enough to his business to collect the dividends in which the bank had no interest so far as the record shows? One of the brokerage companies in whose name some of the stock was registered was insolvent. There is no evidence as to the standing of the others. The fact that Hutton & Company actually recovered the stock would not render Mr. Trost's services less valuable. The principal items of service Mr. Trost rendered were his idea of making the investigation and the result obtained, since it cost nothing but a little stationery and a few stamps. Mr. Trost testified that Mr. Woodruff was reluctant to write the bank about the matter because he did not want to disturb his $50,000 loan. If that is true, and the jury evidently thought it was, Mr. Woodruff did not have much faith in the idea that any stock was missing. We cannot say as a matter of law that the services in recovering the 1200 shares worth $190,000 and collecting $6800 in dividends were not of the reasonable value of $5000. It is contended that the plaintiff was estopped to contend that the reasonable value of the services sued for in count 2

was $5000 for two reasons: (1) that the plaintiff billed Mr. Woodruff for $500 for the identical services and, (2) because in another suit for the value of the same services, Mr. Trost alleged the value of the services to be $500, which other suit was dismissed before the instant action was filed. Neither of these contentions is sound. The bill sent Mr. Woodruff is simply in the nature of an admission, the weight to be attached to which, as against direct testimony, is a jury question. As to the allegation in the former action, it stands on the same footing as stricken pleadings, which present jury questions and which are not admissions in judicio. In the cases cited by the plaintiff in error the pleadings held to estop were never dismissed or stricken from the court records. These cases are *Long* v. *Lawson*, 7 *Ga. App.* 461 (67 S. E. 124); *Koplin* v. *Shartle Brothers Machine Co.*, 150 *Ga.* 509 (104 S. E. 217).

■ It was not error to overrule the motion for new trial as to count 3. Paragraph 3 of count 3 alleged in substance that in the early part of 1937 the defendant employed the plaintiff to prepare certain enumerated individual income-tax returns to be filed with the United States Government and with the State of Georgia. Paragraph 5 of this count alleged that the plaintiff and the defendant agreed upon a compensation of $750 to be paid the plaintiff for these services. There was no demurrer to this count. The allegation as to the agreement for compensation can be construed as having been made at the time of employment or after the completion of the work. There was sufficient evidence to authorize the jury to find that the services were performed under an agreement and that the compensation sued for was afterwards agreed upon.

■ As the errors complained of in grounds 6, 7, 14, 15, 16, 18, 19, 23, 25, 26, and 27 of the amended motion will not likely occur on another trial no ruling is made on them.

■ Grounds 12, 13 and 24 are incomplete and will not be considered.

■ There is no merit in any of the other grounds of the motion as the assignments of error are made therein.

■ "An assignment of error upon the refusal of the court to award a nonsuit will not be considered, where thereafter the case proceeded to a verdict in favor of the plaintiff, and the defendant's

motion for a new trial, to the overruling of which exception is taken, includes the ground that the verdict was contrary to the evidence and without evidence to support it." *Wakefield* v. *Lee,* 18 *Ga. App.* 648 (90 S. E. 224).

The court erred in overruling the motion for new trial as to count 1.

The court did not err in overruling the motion for new trial as to counts 2 and 3.

*Judgment affirmed in part, and reversed in part.* *Sutton, P. J., and Parker, J., concur.*